UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
UNITED STATES OF AMERICA,      :

                                :                  **OPINION & ORDER**

        -against-          :                  05-CR-942 (DLI)

                                  :
NELSON MARRERO,              :

                                :
                   Defendant.     :

                                  :
-------------------------------------------------------- X

**DORA L. IRIZARRY, U.S. District Judge:**

On July 12, 2006, Defendant Nelson Marrero pled guilty to conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(b). (7/12/06 Minute Entry, Dkt. Entry No. 8.) On August 2, 2007, the Court sentenced Defendant to a twenty-four month term of imprisonment, two years of supervised release, and a $100 special assessment. (8/2/07 Minute Entry, Dkt. Entry No. 44.) The Court also imposed standard terms of supervised release, such as the requirement that Defendant refrain from committing any federal, state or local crimes. (*Id.*) Additionally, the Court imposed a special condition prohibiting Defendant from possessing firearms, ammunition or destructive devices. (*Id.*)

On June 7, 2011, the United States Probation Department ("Probation") submitted a Violation of Supervised Release Request for Summons ("Violation Report") indicating that Defendant had been arrested and charged with six violations of New York State law stemming from a vehicle chase occurring on May 30, 2011. In particular, Defendant was charged with reckless endangerment (Specification 1), obstructing governmental administration (Specification 2), resisting arrest (Specification 3), attempted aggravated unlicensed operation of a motor vehicle (Specification 4), disorderly conduct (Specification 5), and criminal possession of a weapon in the second degree (Specification 6). On September 25, 2013, Probation submitted an

Addendum to the Violation Report, regarding new charges filed against Defendant stemming from his alleged June 20, 2013 assault of his girlfriend, Moraima Rodriguez. (Addendum to the Violation Report ("Addendum"), Dkt. Entry No. 322.) In particular, Defendant was charged with assault with intent to cause physical injury (Specification No. 7) and harassment in the second degree for physical contact (Specification No. 8).[1] (*Id.*)

Probation indicated that these charges violated the mandatory condition of supervised release that "the defendant shall not commit another federal, state, or local crime." (*Id.*) The court conducted evidentiary hearings on January 17, 2014 and March 21, 2014. (1/17/14 and 3/21/14 Combined Transcript ("Tr.").) After the conclusion of the hearings, Defendant moved for acquittal of the specifications contained in the Violation Report and Addendum (*see* Defendant's Memorandum of Law in Support of Defendant's Motion for Acquittal ("Def.'s Mot."), Dkt. Entry No. 101), which the government opposed (*see* Government's Post-Hearing Memorandum of Law ("Gov't's Opp'n"), Dkt. Entry No. 102). For the reasons set forth below, Defendant's motion is granted in part and denied in part.

## I. Firearm/Vehicle Charges

### A. Factual Findings

With respect to the charges arising out of the vehicle chase (including the firearm charge), the following witnesses testified for the government: Criminologist Yvette Orihuela, and New York City Police Department ("NYPD") Officers John McNamara ("Officer McNamara"), and Raymond D'Amura ("Officer D'Amura"). (Tr. 108-78.) Defendant did not present any witnesses. The Court finds the government's witnesses to be credible.

---

[1] The Addendum improperly refers to these charges as Specifications 6 and 7. For purposes of this Memorandum and Opinion, the Court will refer to them as Specifications 7 and 8, notwithstanding their inaccurate numbering in the Addendum.

On May 30, 2011, Officer McNamara and his partner were sitting in a marked car on the corner of East Houston Street and the service road leading to the Franklin Delano Roosevelt East River Drive (the "FDR") in Manhattan. (Tr. 142-43.) They observed a Chevy Impala (the "Impala") run a stop sign. (Tr. 145.) The windows of the vehicle were down, music was playing music loudly, and the officers observed that neither the driver, Defendant, nor his passenger, Villin Torres ("Torres"), was wearing seatbelts. (Tr. 145, 149.) The Impala stopped and the officers turned on their lights and parked their vehicle behind the Impala. (Tr. 146.) Officer McNamara observed Torres moving his hands towards the dashboard. (Tr. 161.) The Impala immediately pulled away and entered the FDR heading north at a high rate of speed. (Tr. 146-47, 160.) A chase ensued, during which the Impala jutted in and out of lanes, driving at speeds of approximately 60 to 70 miles per hour. (Tr. 147-48.) The Impala exited the FDR on 34th Street, running a red light and forcing pedestrians to jump out of its way. (Tr. 149.) The Impala turned right on First Avenue; then, turned left on 39th Street, ultimately entering a parking garage on 39th Street. (Tr. 150.) In the garage, Defendant drove the Impala past the parking attendants, where he and Torres abandoned the car and fled on foot. (*Id.*) Officer McNamara and his partner pursued Defendant and Torres on foot. (Tr. 151.) Outside the garage, on 38th Street, the officers ordered Defendant and Torres to stop, but they continued to flee. (*Id.*) A block later, Defendant surrendered, at which point he was arrested. (Tr. 152.) Defendant, Torres, and the Impala were taken to the 7th Precinct Stationhouse. (*Id.*) Defendant was not the owner of the Impala. (Tr. 159.)

On June 1, 2011, Officer McNamara was present for the court-authorized search of the Impala. (Tr. 153.) The officers conducting the search located a customized mechanical trap[2] in

---

[2]     A "trap" is a customized and mechanized hidden compartment in a vehicle "commonly used to hide contraband items." *United States v. Lopez*, 2010 WL 3452380, at *6 (S.D.N.Y. Sept. 1, 2010).

the area of the vehicle that should have contained the passenger side airbag. (Tr. 154.) The trap contained a loaded .38 caliber revolver (the "firearm") inside a plastic bag. (Tr. 154, 163.) Officer McNamara placed the firearm in a locker for the Evidence Collection Team to process. (*Id.*) Officer McNamara then drove the Impala to a nearby office of the Drug Enforcement Agency ("DEA") to determine whether there were any additional traps and to learn about how this particular trap operated. (Tr. 155.) DEA agents demonstrated how to operate the trap, which involved touching a magnet to a sensor on the driver's side of the vehicle. (Tr. 156.) Although a glove compartment box on the passenger's side of the vehicle was located next to the trap, the trap was inaccessible through the glove compartment box. (Tr. 158-58, 160.)

Officer D'Amura, a member of the Evidence Collection Team, processed the firearm. (Tr. 171.) The firearm contained five cartridges and was operable. (Tr. 170, 179.) Officer D'Amura took three swabs of the firearm for subsequent deoxyribonucleic acid ("DNA") testing. (Tr. 173.) He found no fingerprints on the firearm, even though he used fuming and talcum powder testing techniques. (Tr. 175.)

Yvette Orihuela, a criminologist with the New York City Office of Chief Medical Examiner, analyzed the DNA samples. (Tr. 119.) The DNA swabs indicated a mixture of DNA from at least three people, including Defendant but not Torres. (Tr. 122, 124-30.) The statistical analysis of these swabs indicated that it was 8.28 times more probable that the DNA originated from Defendant and two unknown persons than from three unknown persons. (Tr. 131.) Criminologists rely on statistical analysis of DNA test results when the DNA sample is a "mixture" containing the DNA of more than one individual. (Tr. 131.) In this particular case, the statistical analysis provided "limited" support for the proposition that the DNA originated from Defendant and two unknown persons rather than from three unknown persons. (*Id.*)

**B.     Conclusions of Law**

It is well settled that, at a violation of supervised release ("VOSR") hearing, "the alleged violation of supervised-release need only be proven by a preponderance of the evidence, not beyond a reasonable doubt." *United States v. Carthen*, 681 F. 3d 94, 99-100 (2d Cir. 2012) (citing *United States v. McNeil*, 415 F. 3d 273, 277 (2d Cir. 2005)); *see also* 18 U.S.C. 3583(e) ("The court may . . . revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on postrelease supervision, if the court, pursuant to the Federal Rules of Criminal Procedure applicable to revocation of probation or supervised release, finds by a *preponderance of the evidence* that the defendant violated a condition of supervised release . . . ." (emphasis added)). Thus, the Court must determine whether the government has established the charged violations by a preponderance of the evidence.

### 1.     Reckless Endangerment (Specification 1)

Defendant does not challenge the sufficiency of the evidence as to this specification. (Def.'s Mot. at 12 n.9.)  The Court has reviewed the record and is satisfied that the government has established that Defendant committed the crime of reckless endangerment (N.Y. Penal L. § 120.20) by a preponderance of the evidence.  (Tr. 145-49.)  Accordingly, the Court finds that Defendant violated the terms of his supervised release as set forth in Specification 1.

### 2.     Obstructing Governmental Administration (Specification 2)

Defendant contends that the government cannot establish that he obstructed governmental administration because "resistance to a police arrest, unaccompanied by intimidation, physical force or some other physical act, does not support a charge of obstructing governmental

administration because it does not constitute an independently unlawful act as required by the other branch of the statute." (Def.'s Mot. at 12-13 (quotation marks omitted).) Under New York law:

> A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, *or by means of any independently unlawful act* . . . .

N.Y. Penal L. § 195.05 (emphasis added). "The elements of obstructing governmental administration therefore include: (1) prevention or attempt to prevent (2) a public servant from performing (3) an official function (4) by means of intimidation, force or interference." *Lennon v. Miller*, 66 F. 3d 416, 424 (2d Cir. 1995). "New York courts have further held that the official function being performed must be one that was 'authorized by law.'" *Id.* (quoting *In re Verna C.*, 143 A.D.2d 94 (2d Dep't 1988)). Notably, "when failing to obey [an] order creates some other hazard or interference, it can rise to the level of obstruction necessary for obstructing government administration." *Dowling v. City of New York*, 2013 WL 5502867, at *4 (E.D.N.Y. Sept. 30, 2013).

Turning to the evidence in this case, the government has established by a preponderance of the evidence that Defendant committed the crime of obstruction of governmental administration. On May 30, 2011, Officer McNamara observed Defendant driving a vehicle that failed to stop for a stop sign, was playing loud music, and that neither Defendant nor Torres was wearing seatbelts. (Tr. 145, 149.) Officer McNamara turned on his lights and pulled his car behind the Impala, in an attempt to stop Defendant to speak to him about the observed traffic violations. (Tr. 146.) Defendant sped away, and a high-speed chase ensued through the busy streets of Manhattan, threatening the safety of drivers, pedestrians, and the officers giving chase.

(Tr. 146-52, 160.)  Defendant's flight prevented Officer McNamara from conducting a lawful traffic stop, for which Officer McNamara had probable cause.[3]

Contrary to Defendant's assertion, the government was not required to show that Defendant physically interfered with Officer McNamara's attempted traffic stop.  "To fall within this statute the alleged obstruction of governmental administration must have been accomplished either (1) by intimidation or physical force or interference, *or* (2) by an independently unlawful act."  *People v. Alston*, 9 Misc. 3d 1046, 1048 (N.Y. Crim. Ct. Sept. 7, 2005) (emphasis added) (collecting cases).  Although courts describe the elements of this crime somewhat inconsistently, the government has satisfied its burden by a preponderance of the evidence under the plain language of the statute.  "A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, . . . *by means of any independently unlawful act* . . . ."  N.Y. Penal L. § 195.05 (emphasis added).  Defendant's high speed car chase constitutes an independently unlawful act—reckless endangerment in violation of N.Y. Penal L. § 120.20.  Notably, Defendant conceded the commission of this crime.  (Def.'s Mot. at 12 n.9.)  Thus, the government has established by a preponderance of the evidence that Defendant committed obstruction of governmental administration.  Accordingly, the Court finds that Defendant violated the terms of his supervised release as set forth in Specification 2.

---

[3]     Defendant does not argue, nor could he, that Officer McNamara lacked probable cause to conduct the traffic stop.  Officer McNamara observed Defendant run a stop sign, while playing "very loud music," and neither Defendant nor Torres was wearing a seatbelt.  (Tr. 145, 149.)  Upon observing these violations of traffic laws, there was probable cause to conduct the traffic stop.  *See, e.g.*, *United States v. Harris*, 606 F. 3d 42, 45 (2d Cir. 2010) (explaining that an officer had probable cause to conduct a traffic stop after the driver of a vehicle violated New York Vehicle and Traffic law).

### 3.     Resisting Arrest (Specification 3)

Defendant does not challenge the sufficiency of the evidence as to this specification. (Def.'s Mot. at 12 n.9.)  The Court has reviewed the record and is satisfied that the government has established that Defendant committed the crime of resisting arrest (N.Y. Penal L. § 205.30) by a preponderance of the evidence.  (Tr. 150-52.)  Accordingly, the Court finds that Defendant violated the terms of his supervised release as set forth in Specification 3.

### 4.     Aggravated Unlicensed Operation of a Motor Vehicle (Specification 4)

Defendant does not challenge the sufficiency of the evidence as to this specification. (Def.'s Mot. at 12 n.9.)  The Court has reviewed the record and is satisfied that the government has established that Defendant committed the crime of aggravated unlicensed operation of a motor vehicle (N.Y. Veh. & Traf. L. § 511(1)(a)) by a preponderance of the evidence.  (Tr. 147-49, 152, 164.)  Accordingly, the Court finds that Defendant violated the terms of his supervised release as set forth in Specification 4.

### 5.     Disorderly Conduct (Specification 5)

Defendant was charged with disorderly conduct for causing unreasonable noise. Defendant contends that the government presented "no evidence . . . as to any noise."  (Def.'s Mot. at 13.)  Under New York law, "[a] person is guilty of disorderly conduct when, with the intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk therefore, he makes unreasonable noise."  N.Y. Penal L. § 240.20(2).  Officer McNamara testified that Defendant drove the Impala with the windows down, playing "very loud music."  (Tr. 145.) Officer McNamara described the music as "very loud" even though his vehicle was located across from Defendant's vehicle, on the other side of the FDR.  Because Defendant had his windows down and was playing music so loudly that it was considered "very loud" by officers

located across a major highway, the Court is satisfied that the government has established that Defendant committed the crime of disorderly conduct for unreasonable noise by a preponderance of the evidence. Accordingly, the Court finds that Defendant violated the terms of his supervised release as set forth in Specification 5.

### 6. Criminal Possession of a Weapon in the Second Degree (Specification 6)

Defendant was charged with criminal possession of a weapon in the second degree (N.Y. Penal L. § 265.03(3)). Defendant contends that the government presented insufficient evidence of his "knowing possession of the firearm" and that the Court improperly excluded Torres' statements claiming ownership of the firearm as those hearsay statements were reliable and admissible under the statement against penal interest exception to the rule against hearsay. (Def.'s Mot. at 8-12.)

### a. Admissibility of Torres' Statements

As a preliminary matter, the Court must address the admissibility of Torres' written and videotaped statements, as that ruling impacts the evidence to be assessed as to Specification 6. Defendant argues that the Court improperly excluded Torres' statements, in which he claimed ownership of the firearm, contending that those statements were statements against his penal interest and, thus, fall under that exception to the rule against hearsay. (Def.'s Mot. at 10-12.) The government simply counters, in a footnote and without any legal or factual analysis, that "[t]here is no legal basis for the admission of such statements." (Gov't's Opp'n at 14 n.7.) As explained below, the statements are inadmissible as they lack the reliability required to satisfy the exception for the rule against hearsay for statements against penal interest.

Under Rule 804 of the Federal rules of Evidence:

The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:

\* \* \*

(3) *Statement Against Interest.* A statement that:

> (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made . . . had so great a tendency to . . . expose the declarant to civil or criminal liability; and

> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in criminal case as one that tends to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3). Thus, contrary to the government's blanket assertion, the rule provides an arguable basis for Defendant's contention. However, Defendant has not established the requirements for admitting Torres' statements under this exception to the rule against hearsay.

The Second Circuit has explained that:

> [t]o satisfy [the penal interest] exception [to the hearsay rule], the proponent must show (1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement.

*United States v. Wexler*, 522 F. 3d 194, 202 (2d Cir. 2008) (alteration in original) (quoting *United States v. Katsougrakis*, 715 F. 2d 769, 775 (2d Cir. 1983)). "The inference of trustworthiness from the proffered 'corroborating circumstances' *must be strong*, not merely allowable." *United States v. Harwood*, 998 F. 2d 91, 98 (2d Cir. 1993) (quoting *United States v. Salvador*, 820 F. 2d 558, 561 (2d Cir. 1987)). "Moreover, because the purpose of the corroboration requirement is to prevent 'fabrication' from being introduced in evidence, there must be 'corroboration of both the *declarant's* trustworthiness as well as the *statement's*

trustworthiness." *United States v. Preldakaj*, 2010 WL 3154560, at *5 (S.D.N.Y. Aug. 3, 2010)

(quoting *United States v. Bahadar*, 954 F. 2d 821, 829 (2d Cir. 1992)).

Turning to the evidence in this case, at some point after Defendant's arrest, Torres told

Officer McNamara that he had placed the firearm in the Impala without Defendant's knowledge.

(Tr. 162.) Torres prepared a hand-written statement ("Written Statement") that Defendant

sought to admit into evidence at the hearing, which application the Court denied.[4] (*See* Written

Statement, Defendant's Exhibit B (DX-B).) Torres had initialed the Witness Statement, which,

*inter alia*, stated he had been given *Miranda* warnings prior to writing the statement and he had

understood those warnings. (*See id*.) He also signed the statement, as did Officer McNamara as

the witness. (*See id*.) In the Written Statement, Torres claimed that:

> I found [the firearm] on the side of 10 Ave D and I put it in a bag
> in my brother[']s car he didn't know it was there till [sic] the cops
> started chasing us. We ran out of fear. My Brother Ran because
> he had a warrant upstate and a suspended license. They let me go
> from the [Precinct] and My boy Went through the system. I
> show[e]d up this morning to receive his property with his wife and
> I was arrested after he was early this morning.

(*Id*.) Subsequently, Torres went to the District Attorney's office and gave a videotaped

statement claiming ownership of the firearm (the "Videotaped Statement") (Videotaped

Statement, Defendant's Exhibit C ("DX-C")), which Defendant sought to admit into evidence at

the hearing and the Court excluded. (Tr. 160-63.) Since then, the Court has reviewed the

Videotaped Statement, as submitted by Defendant in connection with the instant motion.

The Court is satisfied that both the Written and Videotaped Statements are hearsay and,

thus, are inadmissible unless an exception to the rule against hearsay is applicable. With respect

to the statement against penal interest exception advocated by Defendant, neither Defendant nor

the government has indicated whether Torres was available to testify. For purposes of resolution

---

[4]     In support of his motion, Defendant provided the Court with a copy of the Written Statement.

of this motion, the Court assumes, *arguendo*, that he was not available and that Torres' proclamations as to his possession of the firearm are the kinds of statements that a reasonable man in Torres' position would not have made unless he believed them to be true.

Notwithstanding these assumptions, Defendant cannot corroborate either Torres' trustworthiness or the statements' trustworthiness, both of which are crucial to the admission of these hearsay statements. Officer McNamara testified that, during the initial unsuccessful traffic stop, he observed Torres lean forward towards the dashboard of the Impala. (Tr. 161.) Defendant contends that Torres' leaning corroborates Torres' statement that he possessed the firearm (unbeknownst to Defendant) and that he put it in the trap. (Def.'s Mot. at 10.) However, there is credible evidence in the record that undermines Defendant's purported corroborating evidence. Notably, the trap was only operational from the driver's side. (Tr. 156.) It was impossible to access the trap through the passenger-side glove box. (Tr. 158-60.) There is DNA evidence tending to show that Defendant handled the firearm and absolutely no DNA evidence showing that Torres handled it. Finally, during the Videotaped Statement, it is clear that Torres did not understand how to operate the trap (which he claimed to have operated without Defendant's knowledge or help) and was unable to give a satisfactory description of the firearm. (DX-C.)

There is no evidence as to Torres' trustworthiness. Notably, Torres considered himself closely connected to Defendant, referring to Defendant as his "brother" or his "boy" and describing them as "really close friends" who "call each other brothers." (DX-B, C.) Indeed, Torres helped Defendant's wife by accompanying her to the precinct to collect Defendant's belongings after Defendant's arrest. (*Id*.) When a close relationship exists between a declarant and a defendant, courts tend to exclude the declarant's statement on the ground that the

declarant, by nature of his or her relationship with the defendant, is untrustworthy.  *See Salvador*, 820 F. 2d at 562 (affirming exclusion of a statement against penal interest because the declarant "was not clearly trustworthy since he knew [the defendant] and may have had reason to lie for him"); *United States v. Hoover*, 152 F. App'x 75, 77 (2d Cir. Oct. 24, 2005) (summ. or.) (affirming exclusion of statement against penal interest because, *inter alia*, the declarant "was a business associate and personal relation of defendant" . . . and thus "[h]is motivation for lying was manifest").  Accordingly, Defendant's motion to admit the Written and Videotaped Statements is denied.

### b.        Sufficiency of the Evidence

Under New York law, "[a] person is guilty of criminal possession of a weapon in the second degree when . . . such person possesses any loaded firearm."  N.Y. Penal L. § 265.03(3).  Although it is not specified in the statute, "to establish criminal possession of a handgun the [government] must prove that the weapon is operable."  *People v. Longshore*, 86 N.Y.2d 851, 852 (1995) (recognizing "operability" requirement for convictions of criminal possession of a weapon in the second degree).  However, the government is not required to show that the defendant knew that the firearm was loaded when he or she possessed it.  *See People v. Smith*, 270 A.D.2d 719, 719 (3d Dep't 2000) (affirming conviction for criminal possession of a weapon).  Moreover, the government is not required to prove that the defendant knew that the firearm was operable.  *See People v. Ansare*, 96 A.D.2d 96, 97-98 (4th Dep't 1983) (affirming conviction for criminal possession of a weapon).

Under New York law, "[t]he presence in an automobile . . . of any firearm . . . is presumptive evidence of its possession by all persons occupying such automobile at the time such weapon . . . is found."  N.Y. Penal L. § 265.15(3).  As courts have explained, "the existence

of a firearm in an automobile creates a permissive—not mandatory—presumption that all occupants of the vehicle have common constructive possession of the firearm, absent specific exceptions [the 'automobile presumption']." *Matthews v. City of New York*, 889 F. Supp. 2d 418, 434 (E.D.N.Y. 2012); *see also People v. Russo*, 223 A.D. 2d 484 (1st Dept. 1996) (finding sufficient to establish defendant's guilt beyond a reasonable doubt the People's uncontroverted evidence of defendant's presence in the automobile at the time three firearms were discovered therein). Notably, the automobile presumption does not apply if: (1) the firearm is found on an occupant's person; (2) the vehicle is lawfully operated as a taxi, in which instance the duly licensed driver is not subject to the presumption; or (3) an occupant has in his possession a valid license to have and carry a firearm.[5] N.Y. Penal L. § 265.15(3).

In this case, it is uncontested that the firearm was operable and loaded. (Tr. 170, 179.) Defendant's motion focuses on the sufficiency of the evidence regarding Defendant's possession. Based upon the totality of the evidence presented at the hearing, the Court finds, by a preponderance of the evidence, that Defendant knowingly possessed the firearm found in the Impala on May 30, 2011.

First, Defendant was driving the vehicle in which the firearm was found. (Tr. 149.) Second, Defendant fled from Officer McNamara several times. When Officer McNamara attempted to conduct the initial traffic stop for which he had probable cause, Defendant drove away at rapid speed. (Tr. 146-47, 160.) A high speed chase ensued. (Tr. 147-48.) Then, Defendant abandoned the vehicle and fled on foot, until he ultimately surrendered to Officer McNamara. (Tr. 152.) "Under New York law, evidence of flight is admissible as a form of

---

[5]     Defendant did not present any evidence that one of the exceptions to the automobile presumption is applicable. Accordingly, the Court concludes that none of them are applicable to the facts in this case. Indeed, as a condition of his supervised release, Defendant is prohibited from possessing a firearm, thereby negating the applicability of the exceptions.

circumstantial evidence of consciousness of guilt." *Robinson v. Ercole*, 2008 WL 2522506, at *5-6 (E.D.N.Y. June 20, 2008) (citing *People v. Yazum*, 13 N.Y.2d 302 (1963)). Third, the firearm was found in a trap that only was operable from the driver's side of the Impala, which is where Defendant was sitting. (Tr. 156.) Further, the sensor opening the trap could not be reached by a passenger and the trap could not be accessed through the glove compartment box. (Tr. 158, 160.) Thus, the firearm could not have moved from one location in the vehicle to the trap without Defendant's participation in its movement.

Fourth, there was no DNA evidence from Torres on the firearm. The DNA analysis indicates that the DNA found on the firearm, which was a mixture of the DNA of three individuals, was 8.28 times more likely from Defendant and two unknown persons rather than from three unknown persons. (Tr. 131.) Defendant assails the DNA analysis as weak, contending that the statistical analysis provided "limited support" for the Defendant's possession of the firearm, the criminologist could not exclude secondary transfer of Defendant's DNA to the firearm, and the plastic bag in which the firearm was found was discarded and underwent no testing. (Def.'s Mot. at 8-10.) Defendant further notes that there were no fingerprints on the firearm. (*Id*. at 10 n.6.) The Court acknowledges the weaknesses of the DNA and fingerprint analysis. However, under the totality of the circumstances in this case, the Defendant has failed to rebut the automobile presumption, even when consideration of the DNA analysis is excluded from the Court's analysis. *Lemmons*, 40 N.Y. 2d at 510 ("The statutory presumption establishes a *prima facie* case against the defendant which presumption he may, if he chooses, rebut by offering evidence."). Moreover, the burden of proof at a violation of supervised release hearing is the lower standard of proof, by a preponderance of the evidence, not beyond a reasonable doubt, a much higher standard. The government has amply demonstrated, by a preponderance of

the evidence, that Defendant knowingly possessed the firearm in violation of N.Y. Penal L. § 265.03(3).  Accordingly, the Court finds that Defendant violated the terms of his supervised release as set forth in Specification 6.

## II.     Domestic Violence Charges

### A.      Findings of Fact

In advance of the hearing, the government submitted a letter indicating that it would not call the alleged victim, Moraima Rodriguez, to testify as she "expressed a desire not to testify against the defendant."  (1/10/14 Letter, Dkt. Entry No. 96.)  The government indicated that it would call three other witnesses who would "offer statements made by the victim for the Court's consideration under exceptions to the hearsay rule and, in light of the circumstances, for 'good cause.'"  (*Id*.)  Defendant moved to exclude any hearsay statements from the victim.  (Tr. 6-16.)  The Court reserved decision on Defendant's motion, permitting the government to present its witnesses, noting Defendant's ongoing objection to the presentation of hearsay testimony, and requesting that the parties brief this issue after the hearing.

The government presented testimony from NYPD Police Officer Stephen Volpe ("Officer Volpe"), NYPD Police Officer Marco Carmona ("Officer Carmona"), and Probation Officer Robert Walsh ("Probation Officer Walsh").  The Court finds Probation Officer Walsh's testimony credible.  The Court finds only certain portions of Officer Volpe's and Officer Carmona's testimony credible.  Defendant presented testimony from Defendant's local defense counsel, Frank Rothman, whom the Court finds credible.

Officer Volpe testified that, on June 21, 2013, Moraima Rodriguez filed a complaint against Defendant, alleging that she and Defendant had an argument on the sidewalk outside her apartment and that Defendant "grabbed [her] by her hair, threw her to the ground, punched her in

the face and the body as well as tried to choke her." (Tr. 20.) Ms. Rodriguez told Officer Volpe that Defendant was upset with her because "there was a picture of her and another gentleman posted on a social media Web site called Instagram . . . ." (Tr. 21.) Officer Volpe prepared a domestic incident report, which was admitted into evidence as Government's Exhibit 1 ("GX1"). (Tr. 22.) The second page contained a written statement from Ms. Rodriguez, in which she stated:

> He came to the front of my block stated he wanted me to Explain to him why did this guy posted a pic of me on IG. I ignored him and acted like whatever he came & back slapped me [illegible] and continued arguing with me. I kept ignoring him and he hit me again then he choked me. Pulled my hair and slammed me on to the ground & punched and kicked me on my ribs and then left.

(GX1.) Both Ms. Rodriguez and Officer Volpe signed her statement. (*Id*.) Officer Volpe testified that, before Ms. Rodriguez left the precinct, Detective John Accony ("Detective Accony") debriefed her. (Tr. 25.) Officer Volpe testified that he observed "visible swelling underneath her left eye." (Tr. 22.) Officer Volpe took photographs of Ms. Rodriguez to document her injuries and these photographs were admitted into evidence as Government's Exhibits 2-4 ("GX2-4"). (Tr. 23.) Officer Volpe conceded that the photographs, which were of poor quality, did not document the swelling that he had observed in person when the photographs were taken. (*Id*.)

Officer Volpe testified that, on June 20, 2013, Ms. Rodriguez went to the emergency room after the assault, and was released later that day. (Tr. 54, 62.) Over Defendant's objection, the Court admitted the medical records as Government's Exhibit 9 ("GX9"). (Tr. 23.) The records indicate that Ms. Rodriquez was treated for chest contusions, and rib, right side, and neck pain. (GX9.) She was released later that day and prescribed ibuprofen. (*Id*.) Some of the records contain summaries of Ms. Rodriguez's statements as to the manner in which Ms.

Rodriguez was injured.  (*Id.*)  For example, in one record, the examining physician noted that "[Patient] reports pain to face, back, left neck & shoulder [status-post] assault by her partner at 8am today; [patient] does not wish to file a police report at present."  (GX9.)

On June 22, 2013, Ms. Rodriguez's case was assigned to Officer Carmona.  (Tr. 66.)  On an unrecorded and unrecalled date, within approximately one week of being assigned the case, Officer Carmona, unaccompanied by any other officer, conducted a home visit of the alleged victim.  (Tr. 67.)  He entered Ms. Rodriguez's apartment alone, which was a one-room studio with no furniture other than her bed.  (*Id.*)  He sat on her bed and she stood while they discussed the status of her complaint.  (Tr. 67-68.)  Ms. Rodriguez told him that, on June 20, 2013, she encountered Defendant outside her home, and he was upset about the photographs of her with another man uploaded on Instagram.  (Tr. 68.)  Officer Carmona kept no records of his initial visit with Ms. Rodriguez.  (Tr. 76.)

On June 27, 2013, to follow up on her original complaint, Officer Volpe attempted to contact Ms. Rodriguez by way of a home visit, which was unsuccessful.  (Tr. 25.)  At an unspecified time in late June or early July, Officer Carmona learned that Ms. Rodriguez had recanted the allegations contained in her complaint.  (Tr. 69.)  As documentation of the recantation, the government submitted an email chain (Rodriguez Email Recantation, Government's Exhibit 6 (GX6)), which was admitted in evidence.  (Tr. 70-71.)  It appears that, on June 22, 2013, the day after she filed the initial report, Ms. Rodriguez emailed Detective Accony, stating:

> Good morning detective acconi[.]  [T]he reason for this email is cause I don't want to press any charges[.]  I don't him to get arrested[.]  I went to the 107 this morning at 9:15am but they said you [were] not there.  I just wanna leave everything alone.  I actually called last night an[d] they said the report hasn't been put

in the system.  If you can please call me ASAP at 917-698-2553.
Thank you.

(GX6.)

Then on June 24, 2013, she sent an email to herself stating:

> Good afternoon[.]  [T]he reason for me emailing you was I had
> caught my boyfriend with a girl in his car and fit a rage and got in
> to a fight with the girl and I was beyond mad and made this
> report[.]   I'm sorry for inconvenience for you but I was
> heartbroken[.]  [H]e never touched me[.]  I'm sorry hurt please I'm
> sorry I was mad he got caught cheating and did this report out of
> anger.

(*Id.*)

Finally, on June 26, 2013, she wrote to Detective Accony stating:

> Hey detective[.]  I tried to send this email to you last week an[d]
> by mistake I sent it to myself.  As you can see Nelson Marrero
> should not get arrested[.]  I made up the whole story cause I caught
> him cheating.  What do I have to do to make sure nelson doesn't
> get arrested for something he didn't do.  I feel really bad about it
> an[d] I'm sorry for lying please tell me what I need to do[.]

(*Id.*)

Subsequently, Officer Carmona contacted Ms. Rodriguez to discuss the email
recantation.  (Tr. 71.)  On July 8, 2013, Ms. Rodriguez visited the precinct and stated that she
wrote the recantation email at the direction of Defendant's attorney, Frank Rothman, to make the
case go away.  (*Id.*)  At Officer Carmona's suggestion, she wrote and signed the following
statement:

> On 6/26/13 I went to Nelson Marrero['s] lawyers['] office to meet
> him to ask for help about how to get rid of this whole situation[.]
> [H]e said all I had to do was write a[n] email stating that the first
> report was a lie.  So I went and wrote a false email stating that I
> got into a fight with a[n]other woman thinking the whole thing
> would just go away.  He told me what to write in the email.  (I
> think his name is frank)[.]

(7/8/13 Rodriguez Written Statement, Government's Exhibit 7 ("GX7").) The Court admitted this statement over Defendant's objection. (Tr. 74-75.) Officer Carmona had no further contact with Ms. Rodriquez, and, apparently, took no further action in connection with this case. (Tr. 75.)

On July 15, 2013, Officer Volpe's partner, Detective Carolyn Celona ("Detective Celona"), was able to speak with Ms. Rodriguez on the telephone. (Tr. 26.) Ms. Rodriguez told Detective Celona that she had not had any further contact with Defendant. (*Id*.) On July 18, 2013, Detective Celona attempted another unsuccessful home visit. (Tr. 26-27.) On August 8, 2013, Officer Volpe conducted a successful home visit, speaking with Ms. Rodriguez about her complaint. (Tr. 27.) According to Officer Volpe, Ms. Rodriguez told him that: (1) she does not answer her door unless she knows who is knocking or ringing the doorbell for fear that Defendant might be there; (2) since she filed her complaint, Defendant contacted her and accompanied her to his attorney's office to write a statement indicating that she had falsely accused him in her June 21, 2013 complaint; and (3) "[s]he stated that she did this out of fear of [Defendant] so she would be done with him and not have to deal with him any longer." (Tr. 27-28.)

Mr. Rothman, Defendant's local counsel, testified that Ms. Rodriguez first visited his office on June 26, 2013.[6] (Tr. 185-86.) She entered Mr. Rothman's office alone, but he was uncertain as to whether anyone had accompanied her to his office and was waiting outside his office. (Tr. 188.) She told Mr. Rothman that she observed Defendant with another woman and became jealous and fabricated the assault allegations out of anger. (*Id*.) Further, she told Mr. Rothman that she called the precinct a couple of times to recant her accusations, but was unable

---

[6] Prior to this conversation, Ms. Rodriguez and Mr. Rothman had spoken on the telephone on several occasions, during which she indicated that she had attempted, unsuccessfully, to get the charges against Defendant dropped. (Tr. 186-87.)

to speak with the detective assigned to her case. (*Id.*) She attempted to email the detective a type written recantation, but accidentally emailed herself instead. (*Id.*) Mr. Rothman testified he told her that, if the story was true, she should resend the email to the detective. (*Id.*) He also requested that she email him a copy for his records. (*Id.*) She emailed the detective her recantation and emailed a copy of the recantation to Mr. Rothman in his presence. (Tr. 188, 191.)

Mr. Rothman testified that, subsequently, Defendant was arrested. (Tr. 192.) At a court appearance in August 2013, Mr. Rothman learned that Ms. Rodriguez had written a corroborating affidavit for the police, which surprised him, given their discussion on June 26, 2013, in which she stated that she had fabricated the assault allegations out of jealousy and anger. (*Id.*) Mr. Rothman called Ms. Rodriguez to find out why she wrote the corroborating affidavit and she told him that the police pressured her to write it and indicated that she would be arrested if she declined to write it. (*Id.*) Mr. Rothman invited her to his office to speak about the case. (*Id.*) Mr. Rothman and another attorney from his office met with Ms. Rodriguez in her vehicle. (Tr. 193.) She reiterated that the police "forced her" to write the corroborating affidavit. (*Id.*) She agreed to prepare a written statement and she dictated her statement to Mr. Rothman's associate. (*Id.*) At this point, Mr. Rothman no longer trusted Ms. Rodriguez. (Tr. 195.) At the next court appearance, the prosecutor informed Mr. Rothman that Ms. Rodriguez claimed that Mr. Rothman forced her to recant, and Mr. Rothman informed the prosecutor that he had a written and signed statement from Ms. Rodriguez indicating that the police forced her to write the corroborating affidavit. (Tr. 196.) The parties agreed to settle the case with an adjournment in contemplation of dismissal. (Tr. 196.)

On cross-examination, Mr. Rothman indicated that he did not keep records of his telephone calls with Ms. Rodriguez. (Tr. 199.) Mr. Rothman testified that he had no reason to believe that there were any third parties on the telephone calls. He further testified that, during their two in-person meetings, Ms. Rodriguez was unaccompanied. (Tr. 201-02.)

On questioning by the Court, Mr. Rothman stated that, when Ms. Rodriguez first contacted him and met with him on June 26, 2013, Defendant had not yet been charged with assault and Mr. Rothman was in the midst of discussions with the police as to whether charges were appropriate, given the recantation email. (Tr. 205.) According to Mr. Rothman, the detective wanted to meet in person with Ms. Rodriguez to verify that she wrote the recantation email, but Ms. Rodriguez was avoiding him. (Tr. 206.) Ultimately, Defendant was charged and he surrendered in August 2013. (*Id*.) At the time of Defendant's surrender, Mr. Rothman informed the assistant district attorney of the recantation emails. (Tr. 207.) Mr. Rothman had no information as to whether the assistant ever contacted the detectives to inquire about the victim's contradictory written statements. (Tr. 209.)

Probation Officer Walsh testified that, among the terms and conditions of Defendant's supervised release was the condition that he refrain from committing any federal, state or local crimes, and that Probation reviewed the terms and conditions of supervised release with Defendant prior to his release. (Tr. 93.) Indeed, Defendant signed an acknowledgment of his applicable conditions of supervised release (Government's Exhibit 8 ("GX8")) which was admitted. (Tr. 94.).

### B.    Conclusions of Law

"Revocation proceedings are not deemed part of a criminal prosecution, and, therefore, defendants in such proceedings are not entitled to 'the full panoply of rights' that criminal

defendants generally enjoy." *Carthen*, 681 F. 3d at 99 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)). "'[T]he Federal Rules of Evidence do not apply with their normal force in supervised release revocation [or modification] hearings,' and a district court need only base its findings 'on verified facts' and 'accurate knowledge.'" *United States v. Zielinski*, 2013 WL 536095, at *4 (2d Cir. Feb. 14, 2013) (quoting *United States v. Bari*, 599 F. 3d 176, 179 (2d Cir. 2010)) (additional internal quotations omitted). While the Confrontation Clause and the Federal Rules of Evidence are inapplicable to probation revocation proceedings, a defendant facing revocation of supervised release has rights to certain procedural protections under the Due Process Clause of the Constitution and Federal Rule of Criminal Procedure 32.1. *United States v. Aspinall*, 389 F. 3d 332, 340 (2d Cir. 2004), *abrogation on other grounds recognized by United States v. Fleming*, 397 F. 3d 95, 99 n.5 (2d Cir. 2005). The confrontation right of a defendant in a violation hearing is governed by Fed. R. Crim. P. 32.1(b)(2)(C), which provides that, at a revocation hearing, a defendant is entitled to "an opportunity to appear, present evidence, and question any adverse witness unless the court determines that the interest of justice does not require the witness to appear." Fed. R. Crim. P. 32.1(b)(2)(C); *see also Morrissey*, 408 U.S. at 489.

The Court first must determine whether a proffered hearsay statement falls within an established exception. If the statement does so fall, it is of course admissible in a revocation hearing. *See Carthen*, 681 F. 3d at 100. If the statement is hearsay, then the Court must determine whether there is "good cause" for its admission. *Id.*; Fed. R. Crim. P. 32.1(b)(2). "For statements that would be inadmissible under the Federal Rules of Evidence, a determination of 'good cause' requires the court to balance 'the defendant's interest in confronting the declarant[ ] against[ ] . . . the government's reasons for not producing the witness and the reliability of the

proffered hearsay.'" *Carthen*, 681 F. 3d at 100 (quoting *United States v. Williams*, 443 F. 3d 35, 45 (2d. Cir. 2006)). In addition, "the defendant's interest is entitled to little weight if the defendant caused the declarant's absence by way of intimidation." *Id.*

### 1. Admissibility of Hearsay Contained in Medical Records

There is no dispute that the statements Ms. Rodriguez made to the physicians in the emergency room as to the cause of her injury and the identity of her assailant as recorded in the medical records constitute hearsay. The parties dispute whether the medical records exception to the rule against hearsay supports the admission of those statements.

Under Rule 803(4) of the Federal Rules of Evidence, a patient's statement as documented in a medical record is not excluded by the rule against hearsay if the statement "is made for—and is reasonably pertinent to—medical diagnosis or treatment; and . . . describes medical history; past or present symptoms or sensations; their inception; or their general cause." Fed. R. Evid. 803(4). This exception to the rule against hearsay is premised on the notion that "a statement made in the course of procuring medical services, where the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility." *White v. Illinois*, 502 U.S. 346, 356 (1992). "Statements made relating to cause are admissible." *Johnson v. Tuffey*, 2011 WL 4345285, *5 (N.D.N.Y. Sept. 15, 2011) (citing *McCollum v. McDaniel*, 32 F. App'x 49, 55 (7th Cir. 2002) (per curiam)). However, "a statement identifying the person who caused the injury 'would seldom, if ever, be sufficiently related.'" *United States v. Gabe*, 237 F. 3d 954, 958 (8th Cir. 2001) (quoting *United States v. Iron Shell*, 633 F. 2d 77, 84 (8th Cir. 1980), *cert. denied*, 450 U.S. 1001 (1981)).

Turning to the instant action, the Court admits Ms. Rodriguez's statements as to the cause of her injury—that she was assaulted—as those statements refer to the "general cause" of her

injury and are sufficiently related to the treatment sought to fall within this exception to the rule against hearsay. *See McCollum*, 32 F. App'x at 55 (affirming district court's admission of the victim's statements contained in medical records that he was injured by "assault" as those statements were "consistent with the purposes of promoting treatment, and [were] in response to information reasonably requested and relied on by a physician"). However, the statements identifying Ms. Rodriguez's "partner" or "boyfriend" as the perpetrator do not fall within this exception as they are statements as to the assailant's identity. *See Johnson*, 2011 WL 4345285, at *5 (excluding plaintiff's statements contained in medical records that he was "beaten by the [defendants]" as those statements go to fault and not to the cause of the injury). Moreover, the government did not provide any information as to how these particular statements were relevant to Ms. Rodriguez's treatment.

Thus, the portion of the medical records containing statements as to the identity of Ms. Rodriguez's assailant must be excluded unless the Court determines that there is "good cause" for their admission in accordance with *Carthen*. This determination requires the Court to balance "the defendant's interest in confronting the declarant against the government's reasons for not producing the witness and the reliability of the proffered hearsay." *Carthen*, 681 F. 3d at 100 (quoting *United States v. Williams*, 443 F. 3d 35, 45 (2d Cir. 2006)).

The Defendant has a strong interest in confronting Ms. Rodriguez as her statements, if admitted, and credited, could result in the Defendant's further incarceration. Prior to the hearing, the government indicated that Ms. Rodriguez would not testify as she "expressed a desire not to testify against the defendant" but did not set forth the reasons for her unwillingness to testify. (1/10/14 Letter.) There is some evidence in the record that Ms. Rodriguez recanted out of fear of Defendant; however, that evidence, too, is hearsay. Moreover, Defendant's attorney testified

that Ms. Rodriguez came to his office without Defendant to write her recantation. (Tr. 200-03.) Under these facts and circumstances, there is insufficient evidence for the Court to make a finding that Defendant is responsible for Ms. Rodriguez's failure to testify. If there was evidence of such intimidation, the Defendant's interest in confronting Ms. Rodriguez would be entitled to little weight and the Court's analysis would be different. *See Carthen*, 681 F. at 100. Thus, the admission of these statements turns on their reliability.

Unlike the victim's hearsay statements, as presented by Officers Volpe and Carmona, which present serious questions of reliability, the statements contained in the medical records do not pose reliability issues. There is no reason to believe that she made false statements in connection with her treatment or that the doctors failed to properly record her statements. Moreover, she named Defendant as the assailant in conversations with two different doctors. This corroboration weighs in favor of their admission. Accordingly, the Government has established "good cause" for admitting the statements contained in the medical records that identify Ms. Rodriguez's assailant as her "partner" or "boyfriend." Notably, the "partner" or "boyfriend" is not identified by the victim by name and there is no other information in the hospital records connecting the Defendant to the victim's assault.

## 2.     Admissibility of Hearsay through Officers' Testimony

There is no dispute that the testimony of Officers Volpe and Carmona as to statements made by Ms. Rodriguez constitutes hearsay. Further, there is no dispute that none of the exceptions to the rule against hearsay are applicable to that testimony. Thus, that portion of their testimony must be excluded unless the Court determines that there is "good cause" for its admission.

With respect to this evidence, Defendant has a strong interest in confronting Ms. Rodriguez regarding her statements as to the domestic abuse incident as those statements, if admitted and found to be reliable, have the potential to result in Defendant's incarceration. As set forth above, the Government has not presented any credible evidence that Defendant is responsible for Ms. Rodriguez's decision not to testify. Thus, the Court will evaluate the facts and circumstances of this case to determine whether the hearsay evidence the Government presented was reliable, such that there is "good cause" for its admission.

The Court concludes that the hearsay evidence in this case is not reliable and is distinguishable from the hearsay evidence that was admitted in *Carthen*. *Carthen* involved the admissibility of hearsay statements of a victim of domestic violence as presented by a Probation Officer. In that case, the Probation Officer interviewed the victim multiple times, and, although she recanted prior to the VOSR hearing, her original statements as to cause of her injuries and the identity of her assailant were corroborated by contemporaneous NYPD records, statements she made under oath before the New York City Family Court, statements by other witnesses to the victim's abuse, her voluntary admission to a shelter for victims of domestic violence, and the defendant's history of violence against women. *See Carthen*, 681 F. 3d at 100-01.

The facts and circumstances of Ms. Rodriguez's statements and recantations are different from those in *Carthen*. Ms. Rodriguez recanted her complaint the day after she filed it via email to Detective Accony. (GX6.) She then changed her version of the story several additional times. She told the officers that Defendant took her to his attorney's office; however, the attorney testified that she visited him without Defendant and told him that she "didn't want to go forward with the case." (Tr. 187.) Based on this evidence, and the fact that there is nothing in the record other than unreliable hearsay to dispute it, the Court is unable to conclude that Defendant was

involved with the recantation.  There are no additional witnesses to the alleged abuse.  None of the statements were taken under oath or before any Court.  There are no contemporaneous records such as 911 telephone calls or NYPD incident reports.  The medical records provide some corroboration, as Ms. Rodriguez visited an emergency room on the day of the alleged abuse.  However, that corroboration is insufficient to overcome the completely unreliable and inconsistent testimony of Officers Volpe and Carmona.

Notably, in *Carthen*, Probation presented a consistent, thorough, and detailed accounting of the evidence gathered during the course of its investigation, such that the Court felt comfortable relying on Probation's recounting of the victim's statements.  The thorough investigation in *Carthen* stands in stark contrast with the "investigation" the NYPD conducted in this case.  During the course of its "investigation," the NYPD did nothing to locate or interview the Defendant to determine whether he had motive and/or opportunity to commit the assault.  Furthermore, there is no evidence that the NYPD investigated whether the Defendant had a record, had any pending charges or was subject to supervision.

The officers' lack of investigation as just noted is made worse by their poor record keeping.  They made and retained few or no records as to the victim's statements.  Officer Volpe testified primarily from memory (Tr. 36), and Officer Carmona testified exclusively from memory as to a series of events that transpired a year ago (Tr. 76, 78).  As the following indicates, their memories are unreliable.

At times, Officer Volpe's testimony regarding Ms. Rodriguez's statements was contradicted by the scant notes that he kept on his investigation.  For example, he testified that, on August 8, 2013, at a home visit, Ms. Rodriguez told him that Defendant took her to his attorney's office to prepare a false statement, she did so out of fear of Defendant, and she did not

open her apartment door unless she was certain that Defendant was not there. (Tr. 27-28.) Yet, an electronic record of Officer Volpe's home visit indicates that Ms. Rodriguez "stated she has not had any contact with the suspect." (8/9/13 Informational Report ("8/9/13 Report"), Government's Exhibit 3500-JV-5.) Officer Volpe's inconsistent recollection as to a fundamental statement from the alleged victim in this case is troublesome. Indeed, Officer Volpe conceded that his testimony contradicted the 8/9/13 Report. (Tr. 37-38.) Yet, he stated that the 8/9/13 report was accurate (Tr. 64), which would lead the Court to conclude that Ms. Rodriguez did not mention that she feared Defendant or that she recanted out of fear of Defendant. Moreover, with respect to the trustworthiness of Officer Volpe's testimony, at times he had difficulty recalling details of the investigation. (Tr. 19, 47.)

Officers Volpe and Carmona contradicted each other. For example, Officer Volpe testified that officers prepare records documenting visits to victims' homes (Tr. 32-33, 36); whereas, Officer Carmona testified that there is no such requirement (Tr. 80-81).

Second, the poor and sparse record-keeping in this case further undermines the Court's confidence in the reliability of the testimony of Officers Volpe and Carmona. Upon learning that Defendant accompanied Ms. Rodriguez to his attorney's office to prepare a false statement, none of the officers assigned to this case updated the files. (Tr. 35, 37-38, 90-91.) Her recantation was a turning point in this case and raised red flags with respect to witness tampering, particularly in light of the nature of the allegations—domestic violence and the possibility that Defendant's attorney may have been complicit in eliciting the recantation.[7] Moreover, the Court is unable to discern whether any of the victim's statements contained in the government's

---

[7] There is no conclusive evidence to show that Mr. Rothman was complicit in any recantation by the victim; however, the Court finds that it would have been more prudent for counsel to have reported the alleged recantation to the District Attorney instead of instructing the victim as to how to recant her testimony, particularly since he had no other witnesses to these original conversations.

exhibits that were summarized by the officers were in fact accurate. Officer Volpe testified that an officer on duty during intake prepares a hand-written report and passes that report on to the clerical department to prepare the official electronic report. (Tr. 46-47.) He never reviewed the electronic report in this investigation or in any investigation for accuracy. (Tr. 47-48, 50.) He conceded that "there are mistakes that are made within our department" regarding record-keeping. (Tr. 51.) Finally, Officer Carmona took no notes of his conversations with Ms. Rodriguez, testifying solely from memory. (Tr. 76, 78.) For that reason, he was unable to give precise dates or times and could not recount any conversations with fellow officers investigating the domestic abuse allegations or conversations with his supervisor. (Tr. 80-81, 82.)

Third, it is appalling that the officers admitted that they took no action to pursue Ms. Rodriguez's account of potential witness tampering, given that her underlying complaint involved allegations of domestic violence. In such cases, victims routinely recant their complaints out of fear of reprisal. *See, e.g.*, *United States v. Hall*, 419 F. 3d 980, 988 n.6 (9th Cir. 2005) (noting the "well recognized" difficulty of securing cooperation of domestic violence victims). Witness tampering in such cases is not far-fetched; rather, it is expected. Indeed, the Second Circuit recognized this problem and sought to prohibit defendants from benefiting from it, explaining that: "Where a defendant has procured the declarant's unavailability by chicanery, . . . by threats, . . . or by actual violence or murder, the defendant is deemed to have waived his sixth amendment rights and, *a fortiori*, his hearsay objection to the admission of the declarant's statements." *Williams*, 443 F. 3d at 45 (quotation marks omitted).

Remarkably, Officer Volpe never informed his supervisor that Ms. Rodriguez told him that Defendant, the suspect, took her to his attorney's office to write a false statement and that she did so out of fear of the Defendant. (Tr. 38.) Officer Carmona testified that he did not

believe that it was necessary to follow up with Ms. Rodriguez, an alleged victim of domestic abuse, regarding her reports of potential witness tampering.  (Tr. 91.)  Indeed, Officer Carmona became hostile when questioned by the Court about his decision to ignore the potential witness tampering.  The following passage is illustrative:

> COURT:     Well, as you sit here now do you not think that under those circumstances it  would have been worthwhile following up?
>
> WITNESS:   Yeah, I don't believe so.
>
> COURT:     Then why wasn't there any follow-up?  It is a simple question.  Why was there no  follow-up?
>
> WITNESS:   There wasn't.
>
> COURT:     Why?
>
> WITNESS:   I don't know what to say.  I mean, she's saying something to that effect.  I don't really know to investigate the cases of, you know, lawyers, you know, telling witnesses what to write and what not to write.
>
> COURT:     Did you think of trying to find out who might investigate that or reporting it further, yes or no?
>
> WITNESS:   No.

(Tr. 90-91.)  Likewise, at other times, Officer Volpe gave equally vague or intentionally deceptive answers to questioning from defense counsel and the Court.  (Tr. 47-51.)

For all of these reasons, the Court excludes as unreliable the victim's hearsay statements as presented by Officers Volpe and Carmona.  The vast majority of the testimony of Officers Volpe and Carmona was not credible.

### 3.    Domestic Violence Charges (Specifications 7 and 8)

As set forth above, the Court has excluded significant portions of the government's evidence of the domestic violence charges.  Based on the limited, remaining evidence, stray comments in medical records, the Court is unable to find that the Government satisfied these charges by a preponderance of the evidence.  Accordingly, Specifications 7 and 8 are dismissed.

### CONCLUSION

For the reasons set forth above, the government has established, by a preponderance of the evidence, the charges contained in Specifications 1-6, but has failed to sustain its burden of proof as to Specifications 7 and 8, which are dismissed.

SO ORDERED.

Dated: Brooklyn, New York
        July 22, 2014

_____
              /s/
        DORA L. IRIZARRY
        United States District Judge